1440114 McCaig v. Wells Fargo Bank May it please the Court. This appeal follows from an approximately $300,000 judgment against Wells Fargo. After Wells Fargo made a mistake, it posted a piece of property for foreclosure. It was informed of the mistake, pulled down the foreclosure sale, did not foreclose, and the McCaig's never lost possession of the property. For that ... No good deed goes unpunished. Your Honor, that theme runs throughout the case. Wells Fargo acknowledges it made a mistake on how it handled the posting of this foreclosure, but the reason the mistake happened relates to a forbearance agreement, because this whole process began when Wells Fargo gave the McCaig's an opportunity to save a piece of property from foreclosure, waived $23,000 of fees and costs, and gave them three years to catch up on a $20,000 deficit. But this isn't just about foreclosure. This is about them being billed for things they agreed not to be billed for, and that sort of thing as well. Judge Elrod, I don't believe that's correct, and I would like to explain that, because the McCaig's were never billed for any items they weren't supposed to be billed for. Your Honor, I disagree, and I need to explain the context of this loan. Those went to the deed of trust, not to the forbearance agreement, right? That's correct, Judge Jones. In Judge Elrod, there are two obligations here, and the way this forbearance agreement was set up was that there was the underlying loan, which is Allie Vita McCaig's loan, that was admittedly in default, and then there was the separate forbearance agreement between David McCaig, who was Allie's son, and Wells Fargo. And the agreement expressly provided that the underlying loan remained in default throughout the forbearance period and less than until the forbearance agreement was completed. And so as a result, it expressly acknowledged in the agreement that costs could be incurred on the underlying loan. It was only if the McCaig's completed the forbearance term that Wells Fargo agreed it would waive all the late fees and charges. So that set up an unusual situation under which Wells Fargo had to track two scenarios. One under the actual loan with its borrower, Allie Vita McCaig, and the second with McCaig's, who are here today. And so the evidence is undisputed at trial that David and Marilyn McCaig were not charged a single dime that was not allowed under the forbearance agreement, and when they completed the forbearance agreement, which they actually completed after filing this lawsuit, all the fees that Wells Fargo agreed to waive, all $23,000, were waived every dime. You've raised a bathtub full of issues about the application of the Consumer Debt Act here. And frankly, some of those issues do not appear as well taken as other issues, and I would like you to summarize for us what are the most important points in regard to your statutory arguments. Yes, Your Honor, and I really do want to spend most of my time today talking about the statutory arguments. There are several, though. Just to briefly say what are the true important points of law that this case will be precedent for in the future are going to go both to interpreting the Debt Collection Act as well as the issues of who has standing to assert a debt collection violation. Those issues are issues that come up repeatedly and have very little guidance from the appellate courts, both at the state and the federal level. With respect to the specific statutes, though, I think this is very important. I'm going to start with question four of the jury charge. That's the question that had five different theories in a single question. It raises a procedural issue we talk about in our brief. But you didn't even object to it. We objected to the substance of that question, and it's actually on page 5823 of the record. We objected that there was no evidence to support the submission of any of those theories. And we believe that objection is sufficient to preserve the issue of multiple theories being submitted. We didn't object to the theory of violation. This is in the state court. And doesn't our case law say that if any one of those theories supports it, and we can assume that it's supported by the evidence, that that can be sustained where we have no objection to the charge? Your Honor, I disagree. First, the Muth case that we cited in our brief I believe sets the standard. It's the opposite of that. If any one of the theories fails, then there needs to be a new trial. Unless it's harmless there. That's correct, Judge Jones. And it can be harmless if any one supports it, and you didn't object to the regulation so we can't tell that it was harmful. Your Honor, I disagree. This court's precedent does not set that standard. This court's precedent is the Muth case. An objection was made to the charge to the substance of the charge. There's a case more recently called Wellogix v. Accenture. It's a case where the court found the objection was waived. And it's interesting because before coming to that conclusion it says, here's what the party didn't do. It didn't object to the substance. It didn't object to the form. It didn't ask for a new trial. And it gave a laundry list of things that could have been done. What happened in this case is we objected to the substance and we moved for a new trial. And we believe that under this court's precedent that should be enough. Why didn't you object to the form? You had all these little laundry lists of objections to each part of it. Your Honor, I was not the trial counsel, so I can't speculate on the answer to that question. Okay. Can you tell me why it would not be harmless then? Yes, Your Honor, because there is no evidence to support many of the theories that were submitted. If the evidence supports one of them, then why is it harmless? Because we don't know if that's the theory of the jury accepted. Because the five separate theories were submitted, there's no way of knowing whether the jury has even agreed on the same theory. And I'd point out there are circuit courts, including the First Circuit and others, that would say no objection whatsoever is needed to preserve this type of error when multiple theories are submitted. But that is not the standard. I agree. I agree, Your Honor. And the point is that this court has already adopted a standard that's different than the other circuits. And what I'm suggesting is by subjecting to the form of the question, I'm sorry, the substance of the question, that should be enough and the court shouldn't be widening the disagreement with other courts on what's needed to preserve the objection. Judge Jones, I'd like to get back to the substance of the statute, though, because this is very important. The first or one of the main theories the McCagues relied upon at trial was a violation or alleged violation of Section 301A.8, threatening to take an action prohibited by law. That's probably the broadest worded of all their theories. So I want to use that as my example to talk about the statute. But what we're asking this court to do is what we've asked in the brief, is to go through each of the violations and look at the evidence because there's going to be no evidence to support it. The question of law, though, is what does 301A.8 mean, threatening to take an action prohibited by law? How long has this law been in effect? Quite a while, right? It's been quite a while. I know I believe it dates back at least to the 80s. It may go back further, but I don't know the exact date. Well, I was just amazed because I don't recall having seen an appeal. We've had fair debt collection cases. I just didn't remember a CDA case before. And, Your Honor, there actually are quite a few coming through the courts right now. It's sort of in the mortgage industry. It's become one of the theories that is asserted. Yeah, well, post-2008. That's correct, Your Honor. And there are a lot of decisions from this court addressing motions to dismiss and upholding the dismissal of claims like this. What are their factual allegations about threatening to take an action prohibited by law? What they were saying is you can't foreclose on a contract when you're not in a breach, right? That's correct. So their allegation is there's a breach of contract. I actually call it an almost breach of contract because we actually didn't foreclose. But for today, I'm just going to keep it simple and say that the McCagues are alleging a breach of the contract. We do not believe that is an act prohibited by law under the statute, and there are several reasons why, starting with the plain language of the statute itself. That provision is in a laundry list of other violations. All the other violations are things like using violence against the debtor or threatening violence against the debtor, threatening to turn someone in and have them arrested for not paying their debts. Breach of contract really doesn't fit in with those other types of allegations. But more importantly, when you read the statute, you need to read the statute as a whole, and there's two other places in the statute that are important shedding light on this issue. Section B, 301B, after giving the laundry list, Section B says here are a few things that don't violate the statute. B2 says telling someone you're going to file a civil lawsuit against them doesn't violate the statute. B3 says threatening to take an action or exercise a contractual right that you have or a statutory right doesn't violate 301A. We believe that the plain reading of that is indicating when someone's threatening to exercise a contractual right, even if it turns out later that, whoops, I made a mistake and I can't do that, merely exercising to rely on your contract is not what the legislature intended to be, an act prohibited by law. The next place to look, though, is in a different section of the TDCA, Section 303A2. It's actually one of the violations that McCaig has alleged, but I want to talk about statutory interpretation with this violation first. 303A2 says that it's a violation to engage in an unconscionable or unfair practice of charging debtors, I'm paraphrasing, but charging the debtors fees that are not allowed by their contract. Setting aside the beginning of the statute for a second, that 303A2 talks about a type of breach of contract, charging fees that aren't allowed by the contract. And then it says to have a violation, you must have unconscionable or unfair means of doing so. If 301A8, the act prohibited by law, subsumed a breach of contract, 303A2 becomes completely meaningless. And even worse than that, not only would it be redundant, it would be redundant with an additional element of unconscionability on top of it. I don't see unconscionability in 303A2. It's the beginning of the statute, Your Honor. It's the beginning of the section. Oh, by unfair unconscionable means. Exactly. And each one of these sections has the beginning language like that, which cannot be ignored. Jumping ahead for one second, I'm going to come back to the statutory interpretation on 303A8. One of the things we believe that McCaig's arguments are doing is ignoring the beginning. So, for example, when they talk about the violations under Section 304, they want to ignore the fraudulent, deceptive intent issues. I don't believe that should be done. But getting back to the statutory interpretation on an act prohibited by law, it's not consistent with the statute to say it's a breach of contract. It's also not consistent with common law, and that's an important point. The Texas Government Code, Section 311.023, says that in interpreting statutes, you should also look at the common law. It goes back to the idea that if the legislature is changing the common law or expanding rights, you would expect them to be pretty clear about it. You don't want to have a major shift in the law based upon just unclear on language. You read things in context. You don't read them in a vacuum. So the Government Code tells us we can look at the common law. And here's what the common law says. For contract cases, you have rights for breach of contract claims. The common law has never given a party suing under a contract the right to go get mental anguish damages. The common law has been very careful and guarded, protecting contract issues from being blended over to tort issues. Well, yesterday they filed a 28-J letter with a reference to a very recent Texas Supreme Court case. And, frankly, it came in too late, and I didn't look at the case. The Chapman case, I believe you're on. Right, on non-economic laws. Yes, that's actually the same case that was cited in their previous 28-J letter. That case just stands for the simple proposition of you have to look where the duties are coming from. If you're talking about a contract duty, it's a contract case. If you're talking about a duty from another source, it's another. You go somewhere else. Here we're talking about a statute, the TDCA, so their argument is the duties coming from the TDCA. So are you shifting off of your statutory argument into your non-economic loss issues? Not exactly, because we believe the non-economic loss issues also inform the meaning of that statute. If the legislature really intended to make the TDCA to turn an ordinary breach of contract case into a vehicle that you can now start getting these non-economic damages you can't get in a contract case, we would expect, I believe, to see more clear language. And instead what we have is things like 301B3 that says threatening to exercise your contractual rights is not a violation of this statute. So we believe that the court needs to read the language first as written, read it as a whole, but also read it in light of the common law. Do you have any cases so far that support your reading here? Your Honor, I believe this court has cited some cases. I believe it's been unpublished and they would be cited in our brief. But this court has acknowledged and has affirmed the dismissal of TDCA claims based upon threats of foreclosure because a threat of foreclosure is not the type of conduct that the statute prohibits. And, Your Honor, I believe the cases that the court has said that are cited in our briefs. The statutory interpretation, though, is very important. In that case they have the right of foreclosure. Yes, and, Your Honor, my client has a contractual right of foreclosure. We can make a mistake, and if we make a mistake and do it wrong, we can be held liable for breach of our contract. We can be held liable for wrongful foreclosure. The law gives remedies. The TDCA does not. There are already existing remedies, so this is not a case where the court needs to create new areas of law and open up the doors to the courthouse to all kinds of customer service disputes for people who are frustrated with their experience when mistakes are made. Thank you, Your Honors. Okay, thank you. You have time for a moment. Ms. Robinson. Sorry to interrupt. Do you have a question? I'd be glad to answer it. I'll answer. I may ask a little bit. Okay, because this is not an ordinary breach of contract case. This is a violation of a Texas statute. The Texas statute was enacted to safeguard people who have relationships with lenders, and those people who have relationships with lenders fall into two categories, those who have direct loans and those who have alleged loans. In this case, the McCagues were not directly liable under the deed of trust. However, they wanted to keep their mother's house, and they entered into an agreement with Wells Fargo. Do they live there? Do they live there now? Their son does. Davey does. Yes, sir. The plaintiff. I'm sorry? Who lives in the house? Davey, their son. The son of the plaintiff. Yes. David McCague and David McCague, Jr. are both in the courtroom, and this house backs up to their house. They have a back fence in common. There is a pathway and a garden that goes between the two houses. It is their little casita. It is their little property for the family, and Davey lives there and will probably continue to live there until they are no longer able to take care of themselves. This is not a case of no good turn goes, no good deed goes unpunished. This is a case of a bank, a multinational bank, who can't keep their books straight. The Texas Debt Collection Act prohibits certain things. It prohibits threatening to take actions you are prohibited from doing. In this case, there was a prohibition. The forbearance agreement prohibited them from foreclosing so long as the forbearance agreement payments were being made. At trial, Mr. Dolan admitted that each and every representation, that that forbearance plan had been broken, was false. The jury had ample evidence to believe that Wells Fargo had violated the statute. The obligations under the statute... Why? Why were they violating the statute? I mean, you know, this statute is aimed at the people who call you in the middle of the night and threaten to call your employer, and frankly, I googled it, and one source said it's broader than federal law. One source said it's narrower than federal law. But in many respects, it overlaps the Fair Debt Collection Practices Act, and that has to do with principally third-party debt collectors who go out and absolutely harass and threaten and bludgeon and so on. But, you know, nobody has sympathy to big banks messing up their books, but they were... The McKeggs weren't personally liable. They are not stupid people. They knew they weren't personally liable, right? Yes, and they admitted so at trial. Well, their contract said that. But that doesn't help them when they are struggling to keep their mother's house, when they're struggling to keep their inheritance. The fact that it wasn't reported on their credit really is inconsequential if you're going to lose the house. The house is the main focus. The Debt Collection Act does not limit itself to telephone solicitors. It does not limit itself to collection agencies. Well, they're not arguing that. I agree with you. Okay. Thank you. Can you tell me how Mrs. McKegg is a consumer? What is her consumer debt? It's the alleged debt under the forbearance agreement. She agreed to pay off the arrearage and to pay the mortgage, and she is a signatory to the forbearance agreement. The statute has two categories. It has consumers and alleged consumers, people who have an alleged obligation. But don't you think alleged means disputed? No, I think it's contended. I think alleged means it's not disputed that she agreed to take on that obligation at all. No, I'm not saying that. I'm sort of neutral on the question of her standing. But, no, I mean, when you say alleged debt, normally that means that the debt collector is going and saying, I'm going to take your car, and you're saying I already called the dealership and they said I could make a few more payments late or something like that, which is similar to what's happening here. Alleged means, like, contended, but contended means it's disputable. You know, we had a lot of rhetorical arguments at trial. The whole argument about whether you have a direct standing or an indirect standing, whether you are a consumer or an alleged consumer, and the jury resolved that. The jury found that the McKeggs, each of them, were consumers under the statute. They were given the full statute. We argued that. We argued that because they were alleged to have and testified that they did have this obligation. Are you an obligor? Under the deed of trust, they're not. Are you an obligor under the forbearance agreement? Well, they acknowledge they have an obligation to pay. So the legalistic term, which should not be used in a statute unless there's an indication that it is being used that way, fell and the jury believed that they were obligors, that they were obligated to pay this. That's one of your weakest arguments, but you're probably right as far as, I mean, I'm not in, you know, obligation. Normally you think that a statute would use proper legal language, so I think your argument about layman's language is very bizarre. But let's go on. Let's assume the predicate is laid for a ‑‑ I asked him to set forth his principal legal arguments, and he did them in terms of the violations that are identified in 392.301. So let's go through all five of these, and you tell me precisely what is the evidence in favor of the jury finding, okay? Okay. All right. We start off in 392.301A, a debt collector may not use threats, coercion, or attempts to coerce that employ any of the following practices. Number three, representing or threatening to represent any person other than the consumer to an ‑‑ that a consumer is willfully refusing to pay. That's the letter to the Texas AG. In the letter to the Texas Attorney General, Wells Fargo said the plan had been broken and the macaques were in default. And that's your only evidence supporting that one? Yes. Okay. And there's a legal question about whether Wells Fargo ‑‑ about they had the duty to respond to your ‑‑ Mr. Macaques' complaint, right? I think not. I think you have to respond to the Attorney General, don't you? That's precisely what I'm saying, that Wells Fargo had to respond to the Attorney General. But they had to respond honestly, and they didn't. They lied about it. Well, lying is a strong word. Where is that in the record? In the record it is where they said that the plan was blown when the plan was not blown. And Mr. Dolan admitted at trial that that was incorrect. Well, but the only question, plan was blown. And so that's part of your factual basis for that violation. Yes. Okay. Threatening that nonpayment of a consumer debt will result in the seizure, repossession, or sale of the person's property without proper court proceedings. On multiple occasions, the macaques received correspondence that indicated that the home was in the foreclosure process. It did go so far as to be posted on the courthouse steps. Because of the forbearance agreement, Wells Fargo did not have the right to foreclose, to an extrajudicial foreclosure. They did not have the right, and they were threatening to do so. In order to get that right, they would have to file suit, perhaps a declaratory judgment action, to determine that the forbearance had been blown. When they admit the forbearance had not been blown. Well, they never, as I, am I not correct, did they send a letter to the macaques saying the forbearance agreement had been blown, or did they just send the notices of acceleration and notices of, you know, just the regular foreclosure notice document? There was both. There was a letter that was actually addressed to their attorney at the time, Vaughn Westheimer. Now, was that in February, or was that back in the preceding year? February, is they're moving toward foreclosure, or was that back in the preceding? Wasn't that the first notice? I'm just saying. Okay, I'm unclear on your question. It was one of the very first things that happened. That's my point. Yeah. In 2008, they entered into the forbearance agreement. Shortly thereafter, in 2009, they started getting letters saying the forbearance has blown, and they started getting notices of acceleration. And they went back to their lawyer, who had helped them in 2008, Mr. Westheimer, and he wrote to the attorney for Wells Fargo. And the attorney wrote back and said, the plan has been blown, and you're behind this much. And that was false. Well, so maybe you should have sued the lawyer for misrepresentation, too. Well, I think that there is a qualified immunity that when you do what your client tells you to do in the banking industry, and I believe that there are southern district cases that support that. If he's a debt collector, I'm just saying the ramifications of this are very broad. Okay, so your basis for 30187 is that your contention is that all of the foreclosure proceedings had no legal basis, and therefore they would have been, quote, without proper court proceedings. Correct. Okay. One of the other rhetorical arguments we made during trial was what to forbear means. To forbear means to withhold some action. A forbearance agreement agrees to withhold some action. I'm very well aware. The panel is very well aware. We're not a jury. Okay, 30188, threaten to take any action prohibited by law. Again, this goes back to the forbearance agreement prohibits them from extrajudicial foreclosure. But why is that forbidden by law? Because there is an agreement between them that is legally enforceable. So every breach of contract is prohibited by law, according to you? No, ma'am, not necessarily. In this circumstance, because we have a specific agreement that prohibits an extracontractual foreclosure while the payments are being made, yes. There are many, many other contracts that would not have those kinds of narrow terms, and I don't believe those would violate the Debt Collection Act. But this specific one, they agreed to forbear and didn't. Okay, and then what is the point of 301B3, the exception? In other words, 301A does not prevent a debt collector from exercising or threatening to exercise a statutory or contractual right of seizure, repossession, or sale. That does not require court proceedings. That would apply in more of a first-party case. Had they, had Alavita McCaig been alive, and had they never signed a forbearance agreement with the McCaigs, then threatening a nonjudicial foreclosure when they have the right to a nonjudicial foreclosure would be covered by that exception. This case does not apply in that exception because they gave away that right by the forbearance agreement. They agreed that they would not enter into an extrajudicial foreclosure so long as the payments were being made, and it's uncontested the payments were being made. Okay, so in any, if they were personally liable on the mortgage, it's your contention. Even if Wells Fargo made an error, they would not, 301B3 could apply. It could. That isn't the case we've got at hand. Okay. And then there was one more. Was there not 303A, 303A2? Am I right? Yes. Collecting or attempting to collect interest or charges incidental to the obligation unless the fees are expressly authorized by the agreement. Well, the fees were expressly authorized in the deed of, you know, right? Yes, and again, the forbearance agreement interrupts that. It supersedes that. It follows after it. Does it say so? It doesn't. It says that the loan continues to be in default. Does it not? It doesn't. That's so long as you comply. Yes, and it says that they will waive all of these charges up to the date that that was signed in 2008. What we found in the records that we got from Wells Fargo was that after 2008, they continued adding late charges and other charges that would not have been applicable because the forbearance agreement was being paid. But they didn't collect them, though. But they were threatening to collect them. They were adding them to. But 303A2, as Judge Elrod said, focuses on the fact that they never, they waived them at the end of the forbearance agreement, and isn't that precisely what the forbearance agreement said? The forbearance agreement said they would waive 23,000. At the end, they actually waived somewhere around 27,000 because they had added additional charges after 2008 and before 2013 when the arrearage was finally paid off. Did there have to be efforts made to say, oh, that shouldn't be on there and y'all are messing this up, or did they readily concede and never try to attempt to collect that money? You know, was it to jump in front of the books and meet with them repeatedly and say, this shouldn't have been charged, this shouldn't have been charged? I got involved in April of 2012. In April of 2012, a letter was sent saying, you guys have been screwing up this contract and there are misrepresentations about the amount that's owed and there's additional charges. After that letter, we got a letter back saying, oh, we'll take care of it. But in August, there was another forbearance notice of 2012. So there were no meetings. Wells Fargo would not meet. But was there ever a time where, other than the original note calculations, where they were told that they owed some fees or charges that should not have been? Multiple times. The testimony of David McKaig was that he would call their consumer hotline. And every time he called, he was given a different erroneous number of what was owed, because the records the computer were keeping were inaccurate. They had two sets of books. It's very difficult to determine how much is owed when you get the terms in the court. It moves on a daily basis. I'm sorry? Fees, things like that move on a daily basis when interest is towed. I know. But the problem is not that the records are moving. The problem is the records are inaccurate. They waited as long as five months to credit payments at times. Well, I'm sorry, but your whole case is turning on the forbearance agreement, superseding this and superseding that, and breach of contract is one thing. Violation of the Debt Collection Act is something else. And, you know. Can I ask a question? Do you have one more? Well, I did have one more. I think your other, your final, that's one, two, three, four. Is that all your, those are five different claims. Do you have another claim under 304? I'm not as conversant as you are with the section statutes. Well, I'm talking about your jury, your jury, well, your jury for question four listed five different violations. Correct, correct. I have them highlighted here in my copy of the statute. So I know it's A7, A8, B2, and A2, and A3. So maybe that's all there were, five. Correct. There were five. Okay. I'm assuming that was the case. Yeah. May I? Go ahead. Sorry. I have a question about the expenses used to SID certify funds, to become certified. Why is that attributable to this, the recovered damages? The method of payment seems to be within control. It was an actual loss, which they incurred because Wells Fargo was repetitively claiming that they were in foreclosure when they were not. They were repetitively claiming that the payments had not been made when actually they were made but not credited. Wells Fargo was repeatedly telling them the wrong balance. It is a reasonable expense to protect yourself from this kind of overreaching conduct, which violates the Debt Collection Act. But you protect yourself if you have receipts that they're actually sent. Right. But the forbearance agreement said there would be no grace period. Correct. So you had to send these by FedEx. Yes. Right. So they voluntarily did that in order to comply with the contract. They voluntarily did that to protect themselves from the overreaching of Wells Fargo. Now, look, we know your position about overreaching, so you don't just answer the question. Before, in the short period before these adverse notices started coming, were the McKegs sending these payments in by FedEx? They started sending them in by FedEx almost immediately. Because of the no grace period. However, as time passed on, it became very apparent that they needed to do this to protect their record keeping and to protect themselves from the threats. Can I ask a question? Go ahead. I have a question also about the AG complaint. The defendant's position is that they had a right to respond. And your position is that they didn't have a right to respond untruthfully. Correct. Accurately. Correct. Do you have any cases that say that even when you're compelled to respond, if you misspeak, whether it's intentional or accidental, that you can be liable? I don't recall any cases, but we do have evidence in the record. Mr. Rusty Williams testified. He is a banking expert. He has many, many, many years in the banking industry. And he says that truthfulness in response, accuracy in bookkeeping are the lifeblood of the banking industry. And there's evidence in this record from which a jury could infer that it was not just a mistake but that it was a lie? Yes. And that would be Mr. Dolan's testimony. Who's Mr. Dolan? He was the corporate representative of Wells Fargo. And he admitted to you that it was a lie? He admitted to me that it was erroneous and shouldn't have been sent. Okay. And my last question is about your attorney's fees, which is quite generous, even reduced. And how long did you testify about that? I testified on two different days, and I don't really know how long it was. It felt like years, but I think the first time would have been about 20 minutes, the second time about 30 minutes. And so you were reconstructing a couple years' worth of representation of the McKegs, is that right? Yes. And I had our computerized system to help me do that. Yeah, but you had had a little hiccup in your law license during that period, right? I did. How did you deduct that? I presented that information to the judge, and the judge didn't deduct it. Instead, she cut back some of our travel time. And what is your billing hour, billing rate? $350 an hour. All right. All right. Any further questions? Okay. Thank you very much. Your Honor, I have just a couple of quick points on rebuttal. First, during my opening argument, Judge Jones, you were asking me about cases that supported our interpretation of the statute. And we were specifically talking about Section 301B3 at the time. I would refer to the court to page 27 of our brief. There's the unpublished Singa case from this court, as well as some other district court cases cited that we believe support our position. They're not exactly the same as this case, but they do support our reading. As well as the Powell case that was cited by the McKegs in their 28J letters submitted yesterday. Judge Elrod, you asked a question about Mrs. McKeg and her standing as a consumer to be pursuing the Debt Collection Act claim here. She has no standing. And the argument that we heard today is the same argument we've heard in the briefs, which is that the issue was presented to the jury, and the jury decided, did she have an obligation on the contract? But if you read the forbearance agreement and the settlement agreement, it expressly says there is no personal liability on the part of the McKegs. They could have walked away at any time. They had no obligation to pay anything to Wells Fargo. They had the right under the forbearance agreement to make payments and to keep the property from being foreclosed. But there was no obligation whatsoever. And if she has no obligation, she can't have standing under the consumer language of the statute. But she also doesn't have standing for other reasons. Because if you look at the communications, she was not the target of any of the communications. She never got on the phone with Wells Fargo. She testified they wouldn't talk to her because she wasn't the authorized person. She is here as a bystander, and there is no such thing as bystander standing for a claim like this. The Texas Supreme Court has been very clear. We've cited cases in our brief, been very hesitant to extend bystander standing for mental anguish claims like this. Can you help me with the claim about the A.G. letter? Yes. You argued that you had a bond that you can't be liable. Yes. But I don't see any authority for that proposition. And, Your Honor, I'll tell you, I looked. I don't have an authority to decide. I haven't found it yet. But it is, I believe, a logical principle, first of all. But then I'm going to come back to the TDCA language, which is going to be more important. It's a logical principle when someone files a complaint against you with the A.G. I think you have an obligation to respond. Ignoring the A.G. You said that. Yes. Ignoring the A.G. is not a good idea. If you have an obligation to respond, it doesn't mean that you're shielded if you say incorrect things. Theoretically, that's probably right. And the A.G., if the response is inaccurate, has the ability to take their actions. But let's talk about why this is not a TDCA claim. And there are several reasons. And, first, at trial, the A.G. letter came up related to question six. We've been talking mostly about question four. But the arguments on the A.G. letter related to question six of the jury charge, which was making false representations to a third party to try to get a consumer to pay an undisputed debt. The first problem is forgetting standing for a second. They have no standing because the letter doesn't even address the McKaig's obligations. It addresses Ali Vita McKaig's obligations. But even if you push that aside, the A.G. communications exist for one reason only. There was a dispute. The McKaig's contacted the A.G. and said, we need your help with the dispute. And Wells Fargo responded. Never said this is an undisputed debt. It's a dispute. Under the plain language of the Texas Debt Collection Act, talking to a third party about a disputed debt is not a violation. It's plain language of the statute. And, again, there's also a severe standing problem. If you look at the A.G. response, the response talks about Ali Vita McKaig's loan. Marilyn McKaig's not mentioned at all in the letter. David McKaig is only on the C.C. line at the end of the letter, only mentioned because he's the person who filed the complaint, so he was copied on the response. Did your client, Mr. Dolan, admit that there were lies in that letter? Absolutely not. What he admitted is that there were mistakes, and that's a big difference between a lie and a mistake. But the jury heard him and could have decided that he was lying instead of making mistakes, right? Yes. And that's been the jury's problem at that point? That's right. The jury gets a chance to assess the credibility. But let's talk about what the jury heard on the inaccuracies because there's an important point. This is certainly a situation that wasn't handled as well as it should have been handled. But what the jury also heard was from three longtime experts in the mortgage industry, two hired plus Mr. Dolan, a plan like this for three years to give someone three years to catch up, unheard of. None of the experts had ever seen something so long, and all of the mistakes that happened were because Wells Fargo was trying to handle a very unusual plan that was for the McKaig's benefit in the context of its existing systems. They certainly made mistakes, but a $300,000 judgment should not be affirmed. Thank you, Your Honor. Okay. Thank you, sir.